Filed 7/31/14  In re M.B. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re M.B., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,  Plaintiff and Respondent,  v.  B.T.,  Defendant and Appellant. | A140371  (Humboldt County Super. Ct. No. JV120069) |

M.B., the daughter of appellant B.T. (Mother), was detained by the Humboldt County Department of Health and Human Services (Agency) on allegations Mother failed to protect her and was unable to do so as a result of Mother's drug use.  After a year of unsuccessful reunification services, the juvenile court terminated Mother's parental rights and set adoption as the permanent plan.  Mother contends the juvenile court's finding that M.B. was adoptable was not supported by the evidence, the court erred in failing to find a "beneficial" parental relationship, and the Agency failed to comply with the notice requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; ICWA).  While we find no error in the juvenile court's findings on adoptability and the parental relationship exception, we agree the Agency failed to comply with ICWA.  We enter a limited reversal of the order terminating Mother's parental rights and remand for compliance with the notice provisions of ICWA.

# I. BACKGROUND

Mother's then five-year-old daughter, M.B., was the subject of a dependency petition under Welfare and Institutions Code[1] section 300, subdivisions (b) and (j), filed April 18, 2012.  The petition alleged Mother, with whom M.B. lived, had been arrested for a probation violation and child endangerment after cocaine and heroin were found in her residence within the reach of the child.  The juvenile court detained M.B. and later sustained the jurisdictional allegations of the petition.

The Agency's initial report stated Mother was on probation for drug-related criminal charges when a police search occurred.  A man who lived in the same residence was found to be under the influence of heroin, and heroin was found in baggies on the floor of his room.  A small amount of heroin and cocaine were found in Mother's bedroom, within M.B.'s reach.  Mother admitted having relapsed into drug use two months earlier, after abstaining for a period of two years.  Despite her circumstances, M.B. was reported to be clean, in good spirits, and well-behaved.

As required by ICWA, the Agency inquired into M.B.'s Indian ancestry.  Mother disclaimed any Indian heritage, but M.B.'s presumed father (Father) reported possible Cherokee ties through his mother, with whom he was living.[2]  On May 16, 2102, the Agency filed Judicial Council form ICWA-030, the statutory notice of Father's possible Cherokee ancestry, but it omitted some of the information required by the form, notably the birthplaces of Father and Father's mother and any useful information about Father's grandparents beyond their names (and not all the names).  It also failed to attach M.B.'s birth certificate.  The notice was sent to three Cherokee tribes, all of which responded negatively.  Based on this inquiry, the juvenile court found ICWA inapplicable.

Although Mother began a drug treatment program immediately after M.B.'s detention, by late May she had stopped attending.  During a visit with M.B. on June 1,

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] Although Father was a participant in the proceedings below, he has not appealed the termination of his parental rights.  We therefore do not discuss his role, other than as it relates to the ICWA issue raised by Mother.

less than two months after her detention, Mother appeared to be under the influence of methamphetamine. One week later, she failed to appear for a drug test. Mother was granted reunification services, which were extended at the time of the six-month review, but her compliance with the reunification plan was spotty at best. A year after M.B.'s detention, Mother had not found permanent housing, had been in and out of drug treatment programs without making progress, had not participated in services, and was generally dismissive of Agency representatives. Mother's reunification services were terminated at the 12-month review hearing, and a section 366.26 hearing was scheduled.

The one constant in Mother's efforts at reunification was her participation in visitation with M.B., whom she unquestionably adored and with whom she was "closely bonded." Throughout the proceedings, Mother and M.B. had a minimum of three visits per week, lasting two hours each. Although Mother's attendance was fairly consistent, her conduct was not. Sometimes she was very engaged with M.B., but on other occasions she was lethargic and inattentive. At times, visit supervisors observed Mother spending extended periods in the bathroom, after which she would emerge "agitated and tired."

M.B. cycled through two foster placements in the first five weeks of detention before landing with "Non-Relative Extended Family Members," where she was initially "happy" because she was familiar with the family. Despite missing part of her year of kindergarten due to Mother's struggles, M.B. was deemed "on track educationally." She was described as a "very sweet and playful young girl," "a natural leader [with] an especially active imagination," and "very smart." Within six months after the detention, M.B. was doing well in school and had adjusted to the new family, although she had an at times "slightly antagonistic" relationship with a foster sister her own age, who could become " 'territorial.' "

Thirteen months after the detention, M.B. was showing some signs of distress in her placement, with frequent bed-wetting and occasional tantrums. She continued to have conflict with two foster siblings, who were described as exhibiting "aggressive behaviors." The foster sister, in particular, "has a temper and . . . teased" M.B. The

3

foster parents "argue a lot and often cause a scene when dropping the kids off at school," resulting in a high level of tension in the home. Notwithstanding these problems, M.B. continued to excel at school, had many friends there, and was considered by her teacher to be "a good role model." Although she participated in counseling, M.B. was not reported to have any serious physical or emotional difficulties.

By the time of the permanency planning hearing, M.B.'s bed-wetting was decreasing or had ended. Her second-grade teacher described her as "a wonderful student [who] gets along with all of her classmates." The teacher had "absolutely no concerns for [her] academically or socially." Even M.B.'s relationship with her troublesome foster sister had improved since the earlier review hearings.

In an adoption assessment, the Agency discussed Mother's relationship with M.B., noting that M.B. "loves and misses her mother" and enjoyed their visits. However, Mother "has not shown the ability to regularly parent [M.B] or provide for her physical or emotional needs. . . . [¶] . . . [T]ermination of parental rights would not be detrimental to [M.B.] as the benefits of adoption outweigh any incidental benefits to the child of continuing the parental relationship. [M.B.] looks to her current caregivers to meet her needs, not to her mother and father." The Agency believed M.B. "has some understanding of what adoption is and seems to understand that the [Agency] is working on finding her a permanent home." The assessment concluded M.B. was "generally adoptable . . . [without] any special medical needs, developmental concerns, or educational concerns." A "maternal family member" had begun visiting with M.B. and was considering adoption, and the Agency had located an approved adoptive home that was interested in adopting M.B.

The juvenile court terminated Mother's parental rights and adopted the Agency's recommended findings, which included clear and convincing evidence that M.B. will be adopted and selection of adoption as the permanent plan.

## II. DISCUSSION

Mother contends the juvenile court erred in finding M.B. adoptable, failing to find a "beneficial" relationship between her and M.B., and in finding ICWA inapplicable.

4

**A.** *Adoptability*

"At a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child—adoption, guardianship or long-term foster care. [Citation.] If the child is adoptable, there is a strong preference for adoption over alternative permanency plans. [Citations.] [¶] A finding of adoptability requires 'clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time.' [Citations.] The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child. [Citation.] . . . If the court finds the child is likely to be adopted within a reasonable time, the juvenile court is required to terminate parental rights unless the parent shows that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)(A) and (B)." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 588–589.) On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child was likely to be adopted within a reasonable time. (*Id.* at p. 589.)

The juvenile court's finding of general adoptability is supported by substantial evidence from which the court could find clear and convincing evidence of a likelihood of adoption. M.B. was relatively young, having just turned seven, was consistently described as having a winning personality, was performing well in school, had no difficulty in making friends, including her temperamental foster sister, and had no particular emotional or physical problems. "A child's young age, good physical and emotional health, intellectual growth and ability to develop interpersonal relationships are all attributes indicating adoptability." (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.) M.B. was not part of a larger sibling group, one factor that can present a barrier to adoption. A relative was seriously considering her adoption, and an approved couple had been identified who were interested adopting M.B. There was, in short, no reason to doubt the likelihood of M.B.'s adoption.

Mother's argument against adoptability is based on M.B.'s age, seven years, her purportedly close relationship with Mother, her history of "developmental and behavioral issues," and the Agency's failure to identify a prospective adoptive family. While it is true seven years is identified in section 366.26 as the minimum age at which a child may be found "difficult to place" under subdivision (c)(3), a child of that age is in no way deemed unadoptable. Given M.B.'s many positive attributes, her age alone is unlikely to be a barrier to adoption. The remaining issues raised by Mother are largely without substance. While Mother and M.B. may have been close, there was no indication in the record that M.B. was so strongly attached to Mother as to impair her acceptance by an adoptive family. Contrary to Mother's claim, M.B. has no significant developmental issues, and her "behavioral issues" appear to have been a reaction to a difficult foster home, rather than a pattern of conduct innate to M.B. By the time of the permanency planning hearing, this conduct had largely disappeared. Finally, although no prospective adoptive family had been identified, two potential families were interested. Accordingly, none of the issues identified by Mother, to the extent they had substance, were likely to materially impair M.B.'s adoption.

Mother attacks the adequacy of the Agency's assessment report, but this argument was waived when it was not raised below. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1317.) In any event, there is no need to rely on the assessment report for evidentiary support for the finding of adoptability; such evidence was found throughout the record. (§ 366.26, subd. (c)(1) [finding of adoptability can be premised on assessment report "and any other relevant evidence"].) Mother also attacks the opinion of the social worker that M.B. was adoptable, but, again, it is unnecessary to rely on that opinion to locate evidentiary support for the court's finding. The entire record presents a strong case for adoptability.

**B.** *Beneficial Relationship*

"Section 366.26 provides that if parents have failed to reunify with an adoptable child, the juvenile court must terminate their parental rights and select adoption as the permanent plan for the child. The juvenile court may choose a different permanent plan

6

only if it 'finds a compelling reason for determining that termination [of parental rights] would be detrimental to the child [because]: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) . . . [¶] 'To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination.' [Citation.] A beneficial relationship 'is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." [Citation.] The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." [Citation.]' [Citation.]

"Overcoming the statutory preference for adoption and avoiding the termination of parental rights requires the parent to show both that he or she has maintained regular visitation with the child and that the child would benefit from continuing the relationship. [Citation.] . . . Satisfying the second prong requires the parent to prove that 'severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' [Citation.] Evidence that a parent has maintained ' "frequent and loving contact" is not sufficient to establish the existence of a beneficial parental relationship.' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642–643.)

It is the parent's burden to show the beneficial parental relationship exception applies. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1345.) There is some difference of opinion regarding the applicable standard in reviewing a juvenile court's finding on the beneficial parental relationship exception, with courts applying either the substantial evidence or abuse of discretion standard, or a combination. (See *In re K.P.* (2012)

7

203 Cal.App.4th 614, 621–622.) We find little practical difference in these circumstances. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315.)

The record holds little evidence to suggest the termination of Mother's parental rights would deprive M.B. of a "*substantial*, positive emotional attachment such that [she] would be *greatly* harmed." (*In re Marcelo B., supra,* 209 Cal.App.4th at p. 643.) M.B. appeared to suffer no significant trauma from being detained and separated from Mother. While Mother visited fairly regularly, the quality of the visits was quite variable. The occasions when Mother was barely responsive presumably did little to foster the bond between the two. While M.B. enjoyed the successful visits, there was no suggestion of an emotional bond beyond such pleasurable companionship. Mother's drug abuse has largely disabled her from fulfilling the type of parental role that is at the heart of the exception. Faced with the prospect of adoption and separation from Mother, M.B. was not reported to have experienced anxiety. In other words, this is an example of the type of "frequent and loving contact" that is insufficient to support the finding of a beneficial relationship.

Mother argues M.B. would "benefit" from a continuation of the relationship because of their long relationship. As noted above, simple "benefit" is not the standard under section 366.26, subdivision (c)(1)(B)(i), which establishes the exception. Detriment to the child, which has been construed to require a relationship of unusual intensity, must also be demonstrated. It is true, as Mother argues, she was M.B.'s primary caregiver for the first five years and appears, judging from the results, to have raised M.B. with genuine parental care, but those facts alone do not establish the necessary relationship. Instead, there must be evidence from the nature of the relationship itself. As noted, there is a loving, companionable relationship between Mother and M.B., but nothing in the record suggests that the relationship is so strong and meaningful that it " 'promotes the well-being of [M.B] to such a degree as to outweigh the well-being [she] would gain in a permanent home with new, adoptive parents.' " (*In re C.B.* (2010) 190 Cal.App.4th 102, 124.) Certainly we cannot conclude the juvenile court abused its discretion in concluding to the contrary.

8

## C. *ICWA*

We agree with Mother that the Agency failed to provide adequate ICWA notice to the Cherokee tribes.

"Congress enacted ICWA to further the federal policy ' "that, where possible, an Indian child should remain in the Indian community . . . ." ' " (*In re W.B.* (2012) 55 Cal.4th 30, 48.) "When applicable, ICWA imposes three types of requirements: notice, procedural rules, and enforcement. [Citation.] First, if the court knows or has reason to know that an ' "Indian child" ' is involved in a ' "child custody proceeding," ' . . . the social services agency must send notice to the child's parent, Indian custodian, and tribe by registered mail, with return receipt requested. [Citation.] . . . [¶] Next, after notice has been given, the child's tribe has 'a right to intervene at any point in the proceeding.' [Citation.] . . . [¶] Finally, an enforcement provision offers recourse if an Indian child has been removed from parental custody in violation of ICWA." (*Id.* at pp. 48–49.) "Thorough compliance with ICWA is required." (*In re J.M.* (2012) 206 Cal.App.4th 375, 381.)

Of concern here is the notice requirement. If an Agency "knows or has reason to know that an Indian child is involved" in a dependency proceeding, the Agency must send notice of the proceeding to, among others, a representative of all potentially interested Indian tribes. (§ 224.2, subd. (a).) "[F]ederal and state law require that the notice sent to the potentially concerned tribes include 'available information about the maternal and paternal grandparents and great-grandparents, including maiden, married and former names or aliases; birthdates; place of birth and death; current and former addresses; tribal enrollment numbers; and other identifying data.' [Citations.] To fulfill its responsibility, the Agency has an affirmative and continuing duty to inquire about, and if possible obtain, this information. [Citations.] Thus, a social worker who knows or has reason to know the child is Indian 'is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.2 . . . .' [Citation.] That

9

information 'shall include' '[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married and former names or aliases, as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known.' [Citation.] Because of their critical importance, ICWA's notice requirements are strictly construed." (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396–1397 (*A.G.*).)

In *A.G.*, the child welfare agency omitted much of the same information from the notice form as omitted by the Agency here, without any explanation in the record for the omissions or description of the efforts made to secure the necessary information. (*A.G.*, *supra*, 204 Cal.App.4th at pp. 1394, 1397.) The court concluded "[e]rror is obvious" and issued a limited remand for ICWA compliance. (*Id.* at pp. 1397, 1402.) While the omissions here were not as comprehensive as those in *A.G.*, the difference is legally immaterial. Further, there is no explanation for the Agency's omissions in the record and no reason to presume the omitted information was unavailable to the Agency. Father was residing with his mother, who could presumably have either provided the Agency with the omitted information or aided the Agency in locating it. Because of the Agency's unexplained failure to comply with the notice requirements of ICWA, we must reverse the juvenile court's order and remand to ensure ICWA compliance. (See *In re Francisco W.* (2006) 139 Cal.App.4th 695, 705–706, 708 [explaining purpose of limited reversal].)

The Agency contends any omissions were harmless. " 'Deficiencies in an ICWA notice are generally prejudicial, but may be deemed harmless under some circumstances.' " (*In re S.E.* (2013) 217 Cal.App.4th 610, 615.) We have no basis for finding these omissions harmless. There is nothing in the record to suggest the omitted information, much of it likely critical in tracing Father's Indian ancestry, would not have resulted in a different response from the tribes.

On remand, the Agency must either obtain the omitted information and provide new notice to the Cherokee tribes or demonstrate to the juvenile court that it engaged in

10

the efforts required by section 224.3, subdivision (c) and California Rules of Court, rule 5.481(a)(4) and was unable to acquire the additional information about Father's family members.

## III. DISPOSITION

The juvenile court's order of September 30, 2013, terminating Mother's parental rights and adopting a permanent plan is reversed, and the court's finding that ICWA is not applicable is vacated. The case is remanded to the juvenile court with directions to ensure the Agency has complied with the notice requirements of ICWA. If, after new notice, any of the Cherokee tribes claims M.B. is eligible for membership and seeks to intervene, the juvenile court shall proceed in conformity with all provisions of ICWA. If, on the other hand, the Cherokee tribes make no such claim following new notice or the court concludes the Agency's efforts at compliance were adequate and no further information about Father's family is reasonably available, the inapplicability finding and the September 30, 2013 order shall be reinstated.

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.

11